Good afternoon, Your Honors. If it pleases the Court, my name is Gail Tucker. I represent the appellant, Plaintiff's Wilsons, in their action against the Forest Service. Roberts Concerns Council, I guess what we've got here is a finding of no significant impact and a claim that the environmental assessment, would the person with the cell phone is making music. It's hard enough to hear without that. Could you please leave the courtroom? The cell phone took me off my concentration. I don't understand what's arbitrary and capricious about saying that a two-foot-wide, 15-mile trail has no significant impact. I mean, I can see the positive significant impact on the environment. You get a bunch of hikers who are enthusiastic about preserving the environment. I don't understand the case. I don't see what the problem is. I think that's what the FONSI relates, but I don't think, and I think the record indicates or demonstrates that there is no rational relationship between the facts as evidenced in the record and that conclusion in the FONSI. In other words, Your Honor. Could you just put that in a very abstract way that doesn't talk at all about the facts of this case? The facts of this case indicate, for one, it's alleged to be a two-foot-wide trail. What's really stated is it's a two-foot-wide tread. Later in the environmental assessment, it explains that, of course, while this is a two-foot-wide tread, what really happened, this is at, as I recall, the excerpts of record C-43, that actually, due to passage of horses on the trail, mountain bikers passing hikers, backpackers passing backpackers, the swath of the trail or affected area will actually be 10 to 20 feet on either side of that tread. I'm looking, let's see, the page that has number 43 at the bottom of the environmental assessment. I see what you mean. Okay. So, in essence, Your Honor, that swath will now go from a two-foot tread to a possibly 40... That's not exactly what it's about. 42-foot. What the paragraph seems to be about is how to manage things in order not to get erosion, how to make efforts to encourage users to stay on the trail. It doesn't say it's going to be a 10 to 20-foot-wide cutting down a brush or anything like that. No, Your Honor. I didn't mean to state that. What it does say is that it's reasonable to expect the impact from that two-foot tread will be 10 to 20 feet on either side. And in that situation, they do say they That's one of the inconsistencies which I believe makes this an arbitrary and capricious... What's inconsistent? What's arbitrary and capricious? They say sometimes a bicycle will go off the trail to go around a horse. Sometimes somebody gets off the trail to let somebody else pass. I don't understand why that's a big deal that requires an environmental impact statement for the trail. Of itself... What we're worried about is some substantial negative impact on the environment. And maybe I'm thinking of the wrong thing on trails. I think of trails like in Alaska where maybe it's just rock cairns that you can see. Maybe it's just a can lid nailed to a tree every now and then. Maybe somebody's cut down brush so you can cross country ski. Now, I know in California they sometimes have what they call trails and they're concrete or asphalt or gravel, what we would call a gravel highway. What kind of trail is this? I thought it was just two-foot wide unpaved. And I think that's the general impression which I think is incorrect, Your Honor. I believe... Is there some fact in the record that shows that's not true? Just what I cited you to. This is the only thing, that sometimes the bicycle gets off the trail to go around a horse, that kind of thing? Yes, Your Honor. But you're not... We're all in favor of the trail, just alternative D instead of C, so... Absolutely, the trails, nobody... Now, it strikes me that your strongest argument is with respect to the Mexican spotted owl. How serious is that? I think it's very difficult to say and that's part of why an EIS is necessary. You have conflicting information in the biological opinion. They finally come around and say, well, it's not going to become extinct because of this trail. We don't have the data. We don't know what happens. We don't know why these owls I believe it's in the biological opinion, page 18. I can check. Where is this? Page 18 of which? In the biological opinion. Oh, I'm sorry, Your Honor, that would be B-18. B-18? Yes. If my memory serves me correct. Where the opinion writer states that the owls have moved, that the owls have undergone stress and they don't know if it's because they become habituated or that they just have no other place to go. Your Honor asked about Alaska. Well, Arizona and particularly the San Francisco peaks are very unique. You don't have mountain range after mountain range as you do in Alaska. The effect on the Mexican spotted owl is relatively unknown. Is there any evidence that there's going to be a substantial adverse effect on the spotted owl? I mean, I read this page 18 you referred me to and it looks like they really thought about this Mexican spotted owl, gave it a lot of consideration and made a decision. It's hard to say they didn't consider it. So I guess you would have to say that the way they considered it is arbitrary and capricious. Your Honor, I would distinguish what I think from that just a bit. I think they, and I don't want to say lip service, I think they noted it and they considered it and then they said we don't know and we're going to go ahead and do it. That's what I read from the record. Well, I'm now on page 13 in tab C, which is page 13 of the EA, where it's kind of in table form. The EA sort of tabulates the It's apparent that alternative C of the various alternatives has the most severe potential impact on the spotted owl. I'm now looking, just reading down column C with respect to MSOPACs, that's sort of jargon for Mexican spotted owl protected activity, what's C, I forget, anyway. Potential increased disturbance in three PACs, new trail construction in two PACs. D, which is your preferred, potential increased disturbance in one PAC. At what point would the potential increased disturbance in a PAC as an EIS required? I don't believe there is any set point. The policy, the Forest Service policy is not to allow construction within the PAC and to limit activity. What's a PAC? Protected Activity Center, Your Honor. It's a big circumference drawn, sort of hypothetically drawn around where the nest is, correct? That's correct, Your Honor. How big is that circumference? Or maybe I should say, how big is the radius out from the nest? I don't know. Okay. But I think it's a matter of miles. It is, yes, it's large. So we could potentially, when we're talking about disturbance in three PACs, the trail could be, you know, half a mile away from the nest, correct? Correct. And we're talking about the disturbance from the construction of the trail itself, which is going to be over some period, I don't know whether they're going to use heavy equipment or just guys with shovels. And then we're talking about people walking. People walking, people riding horses and by some mountain biking. I couldn't understand part of this case because environmentalists talk in abbreviations and I don't know what they mean. I don't know what a PAC is. If I got this right, you're saying they shouldn't build the trail in this location because some owl a half mile away might be disturbed by people walking on it or riding horse on it? I think you're correct, Your Honor. And that disturbance could lead to problems in reproduction. That particular owl might not reproduce? Yes, Your Honor. But I think they said there are plenty of other Mexican spotted owls, no danger to the species. I don't know if there's plenty of others. They're a threatened species. I also know that the Radio Chetescai fire wiped out 55 PACs. They are decreasing, they're diminishing, that cumulative impact of that. Didn't they say, I thought I saw in the environmental assessment that there's no danger that the species is going to be substantially harmed even if some particular owl's reproductive activities are impaired. I believe what the biological opinion said was that there will be damage and harm likely following from this. However, the species is probably not and I think they probably are likely not to become extinct because of this. Why isn't that opinion entitled to deference? In my opinion, it's not entitled to deference because it's not founded on facts. What fact is wrong about that? There's been no studies to show, or recent studies or credible studies according to the record, to show the exact number of Mexican spotted owls or another acronym for you is MSOs, exactly where they're going, why they're going. This hasn't been done since 2000. So there's no reliable data. In fact, as part of the EA and part of the documentation for this, they are directing that the study be done during construction and during the use of the trail, which is, of course, the wrong way to... It takes a long time to go through all this paperwork before they can build a trail. There was a study in 2000. I would think that if the criterion is there's no recent study to show that there are none there, there's no recent study to show there are no elephants there. It doesn't seem very likely that there are elephants there. And if there are, the clear value of the trail has to be considered too. I don't understand why they have to do another study if they already did a study and they've got indications from the previous study. Two things, Your Honor. Number one, there are alternatives. This is not the only place that trail can go. And that's why I highlighted Trail D, because it does meet the trail program requirements and doesn't involve new trail construction within these PACs. They didn't want to do that because it crosses a lot of roads. That's one of the reasons they gave, but alternative C1, if you've hiked in that area, you also know that crosses roads. And you also know in the EA report, and I can cite you the pages if I need to, at one time they say it crosses numerous roads and later in the EA they say alternative D crosses several. And that again is part of my problem, Wilson's problem. With this EA, with this entire analysis, the general terms, nonspecific terms are used instead of the data required by law on which to base these decisions. And that's what makes it arbitrary and capricious. Well, but arbitrary and capricious here, it's easy to slide into whether or not it's a good choice to go with C or a good choice to go with D, considering C's higher up in the mountain with better views and so on. But that's not the question in front of us. I mean, once the study has been done at the appropriate level, whether the appropriate level is an environmental assessment or at an EIS, the Forest Service gets to do any darn thing it wants to, good, bad, stupid, or whatever. The only thing underneath that we are here asked to decide whether they've done properly is whether they've studied it at an appropriate level. So, you know, how many roads they cross and whether it's a good thing or a bad thing, I don't think that's in front of us. I think there's one other step, Your Honors, to determine whether or not those studies are rationally related to the conclusion. Well, I understand that, and that's clearly there. Here's one question I have for you, and I'm on this same page 16 of tab B, that is to say I'm within the Fish and Wildlife Report. At the very bottom of page 16, it says the five PACs affected by proposed action C represent a fraction of the 624 known MSO PACs. So within Region 3 of the Forest Service lands on the Upper Gila Mountain Recovery Unit, I'm not quite sure what geographical area that is, they've got 624 of these PACs. Alternative C will require new construction, trail construction within two PACs and potential increased disturbance in three PACs. So a total of five. That's correct. Why is five out of 624 such a significant impact that we need in EIS? I mean, for me, that really, I mean, there are other things in the case, but that strikes me as your strongest argument that the MSOs, the Mexican spotted owls. I think it's my second strongest, but I agree it's strong. And RU, I'm sorry, I have the same trouble with acronyms, a research unit, I believe it is, is large. Again, you may ask me how large, I know it goes beyond the state. It goes from the Colorado Plateau, I think, down Gila, which is way south. This is Region 3? Yes, sir. Okay. And again, if you look at that pure number like that, it could seem inconsequential. However, these are finite spaces, finite areas. As I said, the Radio Chedisky fire wiped out 55 in one fell swoop. Is that in the record? You've mentioned that twice now. No, Your Honor, it's not. It's not in the record that these were wiped out by the fire? Yes, it is. The record says that wildfire is the main threat to the species rather than people. Yes, and I guess I believe it was, Your Honor. That's probably why I read it. Right. And there is a table that tells how many were wiped out by that big fire. That's correct. It is in the record. It's in the table. Was it by that fire? Yes, Your Honor. When was that fire? If my memory serves me correctly, it was two to three years ago. It was 2002. We're really talking about not building a trail because one particular owl may find its love life disrupted? Is that really what the case is about? No, Your Honor, that's part of the case. Let me ask you this. I've been telling you what your strongest argument is, but you say it's your second strongest. I guess I better ask you directly. What's your strongest argument? My strongest argument, I believe, although you're welcome to disagree with me, is the incremental effects, which were not considered, which are essential to be considered in analyzing this project. The big one, the elephant analogy, the elephant that nobody talks about here, is the major expansion and scope of the snowmobile or snowball project, which is the ski area which this trail establishes a direct link to. It actually runs a spur to the snowball. And to not consider the impact of the snowball enlargement, which is also before this court, scheduled for non-bank hearing, along with this project, again, according to law, makes this an arbitrary and capricious choice and action on the part of the Forest Service. Well, it is mentioned in several places, isn't it? Your Honor, it's mentioned in one sentence conclusions. There's no analysis. There's no analysis on the additional acreage that is being clear cut and thinned. No analysis of the treated sewage that's being spread on the ground. No analysis of the additional population recreationists that will attend. No analysis of the new 400 space parking lot at this trailhead. Those things are lacking. It's a one sentence. The snowball expansion will happen. There's no impact. I believe Ms. Rush... The issue is a bigger parking lot would be built at Snowbowl to accommodate people that want to hike on this trail. Your Honor, there's a myriad of impacts and consequences that have not been talked about. Have I got that one right? Do I understand it right? That's one... I keep trying to translate from acronyms and abstractions to what it is that you're actually talking about. That's one thing I'm actually talking about, yes. There are two major federal projects which I think are physically linked, not just near or reasonably linked. I'm trying to understand your argument in as sort of sympathetic a way as I can. You're arguing that this standing on its own really is misleading and that if you're trying to understand the overall impact, you've got to put the two things together and have a cumulative impact analysis with both the Snowbowl project and this project. That's correct, Your Honor. And cumulative impact on what? On the owls? On the environment, which the owls are a part of, of course. But Your Honor has mentioned, is this just about owls? It's not. There's also construction within, you may not like this either, a PFA. That's a post-fledgling activity or area. What does PFA mean? It means once this glass hawk gets big enough to go out and start doing things on its own, it needs an area in which to fully fledge and become mature. So a PFA is one of those areas that are maintained for that purpose. And it stands for post-fledged activities? Yes, Your Honor. So once the feathers are out and it starts flying around? As much as I can tell. Okay. So that's... What struck me as being the really practical part of this case that had some real impact was actually if you have hikers and bicyclists and people riding horses and whatnot near these people's houses, you're likely to get more vandalism and trespassing and disruption of their gardens and whatnot. But I gather that's not the case they're making. Is that right? That may be a factor that's not one of my favorite or what I believe to be my strongest issues. As long as we're talking about acronyms, let me ask you about your DCA, which is your district court argument. Can you tell me, did you raise this incremental argument in front of Judge Carroll? Yes, Your Honor. Because I notice he doesn't discuss it, I don't believe, in his order. Yes, Your Honor. But it was preserved properly below. Gotcha. Thank you. Oops, I'm sorry. A lot of time. Why don't we do the same thing just to make sure you get a fair shot, even though you've exhausted your time, prepared a half-thirty seconds for rebuttal. Counsel. Good afternoon, Your Honors. May it please the Court. John Smeltzer for the Forest Service. Your Honors, this is a good project. It was extensively studied and well-designed. I don't care whether it's a good project. What I want to know is what's the environmental impact? The environmental impact is insignificant, as described in the finding of no significant impact, Your Honor. Let me address the two points, the principal arguments that were raised by counsel. First, with respect to Try to speak up. The acoustics bounce the sound around. Yes, Your Honor. First, with respect to cumulative impacts, the record clearly identifies the Snow Bowl project as another ongoing project. And with respect to each of the areas where there are potential cumulative effects, that is, for each of the resources where there might be a combined impact as a result of these two projects, those are identified specifically with respect to the impacts within the protected activity centers for the spotted owl and in the post-fledgling family area for the god owl. Where in the EA is there any analysis of spotted owl that's cumulative? That is to say, is there anything in the EA for this trail that talks about disturbance of the Mexican spotted owl if the Snow Bowl project goes forward? Yes, Your Honor. I believe right in the analysis where it discusses the impacts. Where? What I want to know is, okay, I understand from the EA that there are going to be five MSOPACs disturbed by this project. If you want to speak English for those of us who are monolingual, that's fine. Right. What we're talking about, the EA went into this. I'm wondering whether I should be looking at page 23. Sure. The EA is in tab C of the excerpts of record. On pages 23 and 24, the EA steps through and it specifically has a section entitled cumulative impacts. And then if you look at the top of page 24, when it talks about the Snow Bowl protected activity center, it mentions the Arizona Snow Bowl facilities improvement project incorporating also having impacts within the Snow Bowl protected activity center. And then it explains that it's not expected to have an adverse effect because of timing restrictions within that project and the fact that that project also has no habitat modification of the habitat within that protected activity center. That's the one sentence that deals with the owls and the Snow Bowl? Well, that's the one particular sentence that identifies the Arizona Snow Bowl project combined cumulative impacts on that protected activity center. My impression of the EA is that that is the totality of the discussion of how the Snow Bowl would affect the owls. Am I wrong? That's 100 percent of the owl discussion. Well, that's right. And what it's saying is in that sentence is the one area where the Snow Bowl facilities improvement project will impact upon a protected activity center is this one protected activity center, the Snow Bowl, the one out of the five that are at issue in this case. And then it identifies that. It lets you know that. But then it also explains that within this protected activity center, there are timing restrictions on that project. And that project, similar to this project, doesn't have any aspect to it that's going to change the physical environment of that. That's much lengthier than what it says in the EA that you've just said. It's a summary of the sentence, Your Honor, but it's all packed in that sentence. It's not a summary. It's an expansion of it. Summary is usually shorter. Tell me. Protected activity center, that means protected activities of the owls, not protected activities. That's right, Your Honor. There are a number of management tools that are used in these plans and with respect to the owl. One of them, the concepts that's used is protected activity center. Are they a fixed size or diameter? As I understand, the recovery plan for the owl, they're supposed to be 600 acres or larger, and the actual acreage of each of these protected activity centers is included within the record and within the biological opinion and the biological evaluation that was done by the Forest Service. They're 600 acres or larger? Yes. And then within that protected activity center, of course, there's also, if there's an identified nest or roost location, then the Forest Service, one of the management tools they'll use will be to create a nest buffer, which is around that particular nest area. And what you have in this case – So they go looking around for the – the Forest Service people look for the nests? Absolutely, Your Honor. Part of the recovery program is to identify within, when they can, is to survey the protected activity centers and identify where they can, when they can, the specific locations of where the species is roosting or nesting.  I wonder how they do that without disturbing the nests. I'm sorry, Your Honor? I wonder how the Forest Service people avoid disturbing the nests. Your Honor, the research techniques are sound for identifying. And I don't – I can't explain exactly the full survey, but it's call and response and it's identifying locations. And on the Snow Bowl PAC, as I was trying to put the jargon and abstractions into concreteness, the most concrete thing I got was a 400-car expansion of the parking lot. Is that true? Are we talking about a 400-car expansion of the parking lot to accommodate hikers and bicyclists and whatnot? The facilities expansion at the Snow Bowl are related to the ski facility. And my understanding is there are improvements to parking and other improvements at the facility itself. Those particular improvements are not part of this. The ski facility. You're talking about the ski facility. The ski facility. Okay. And one of the big issues at the Snow Bowl that made that controversial was the use of reclaimed water from the City of Flagstaff to make snow. That's another case of ours. But what you're saying is that the expansion of the parking lot at Snow Bowl isn't for the hiking trail, it's for the skiers? There are improvements being done in the parking lot area to accommodate what, under present circumstances, are what they call social trails or user-created trails in the meadow below the parking lot. And what part of this project is to go in and create a well-designed and managed trail that will improve the circumstance that's already ongoing with respect to hiking from the parking lot? It is not part of this project to necessarily create more parking for hiking. There will be a trailhead. That's what I was trying to find out. Are you creating more parking for hikers? There's already parking for hiking there because there's other trails. But what they're going to put in is a trailhead at the Snow Bowl parking lot. I keep dozing off when you get to facilities and improvements and all this, and I want to know if there's more parking for hikers. Not that I understand. Not as part of this project, not specifically for hiking. What is part of this project is putting in a trailhead and creating specific trails that in the meadow area below the parking lot that will improve the situation with respect to people going off-trail and hiking in areas that are bad for habitat maintenance. No, but I understand what's going on with respect to Alternative C-1. In our case, I'm not talking about Snow Bowl, but our case, is that there's a proposal that this trail that's going to go along kind of skirting around the bottom of the mountain and past the Snow Bowl, there'll be a little spur trail that leads down from the parking lot down to the Arizona Trail. And you're trying to get rid of the so-called social trail so there'll just be one established trail. That's the idea? That's correct. The idea is people are going to go from one place to another anyway. Better they should be on one trail that doesn't cause a lot of erosion than just going willy-nilly through the woods and wrecking a whole lot of habitat, as they call it. Yes, Your Honor, and that concept is built into different areas of this project. One of those areas where that concept is built in is in relation to the Snow Bowl parking lot and hiking from that area. Here what you're talking about is a reduction of impact on the environment rather than an increase in impact on the environment because you have one trail instead of many, and it's located where it won't cause as much erosion. In this area and in the Little Springs area, yes, Your Honor. And what the Forest Service identified when they did their assessment here is that there may be an increased intensity of hikers on the particular trail, but when the trails are better designed to not have environmental impacts because they're put in the proper locations and they're away from nesting areas or they go in and out of habitat areas quickly, that's better. I don't have a sense of volume. I go hiking on July 4th weekend, and maybe I'll see three or four other people. I assume that this is a greater population area, more people. What kind of impact are you talking about? I suppose that's in the record, but I didn't see it. Your Honor, the estimates for the place in the record where the most information about the number of hikers is as an appendix to the biological assessment, which we have included in the supplemental excerpts of record. I don't have an exact page number for you. The appendices that apply to that issue are there on pages 29 and 30 of the supplemental excerpts of record and on page 32 of the supplemental excerpts of record. What you have on pages 29 and 30 are an assessment of the existing use of- Five or 10,000 people a month during the good months? This is the annual totals on the right-hand column in Appendix 1, but those totals include all the trailheads in the existing dry lakes, and I'm blanking on the other name, but in this existing trail system in the southern portion of the project area. If you want to just take a moment to answer my question instead of just talking about a lot of other things, just go ahead. I want to know how many people are going to be walking on the trail. Well, the estimates in terms of the hiking is in Appendix 3, and they divide it between paved road access and dirt road access. I mean, you can read it. They estimate 6 to 10 on weekdays, 20 to 30 on weekends from paved road access. Dirt road access, they estimate 2 to 3 on weekdays and 6 to 10 on weekends. So our question is whether- And these estimates were not challenged, by the way. How many people a week are going to create so much impact on the environment that an environmental impact statement is made? Our position is that this issue was studied as to how many additional people will be on the trail system and whether that's a significant impact, and based on this data and the other information in the environmental assessment, that the finding of no significant impact was reasonable, not arbitrary and capricious, and the decision should be upheld. If I can come back to page 24 of the EA, that's at tab C, page 24. Yes. It's this one sentence about the snowball and the owl. Yes, Your Honor. I'll just read the sentence. The Arizona Snowball Facilities Improvement Proposal, that's the separate proposal that's subject to the separate lawsuit, incorporates the Snowball PAC. What is the Snowball PAC? That's the Protected Activity Center that's identified in the record and that there might be or there is some trail impact. Now, is that an owl PAC? Does it say Protected Activity Center for the Mexican Spotted Owl? Yes. That acronym is only used with respect to the Mexican Spotted Owl. And is there only one spotted owl in the entire Snowball area, so there's only one PAC? I'm trying to figure out what this means. A Protected Activity Center, under the recovery plan, is designated for a pair of breeding owls. So you're telling me that there's only one pair of breeding owls within the entire Snowball complex? Is that correct? No, one that would be impacted by the Snowball Facilities Project. When they say it incorporates that, that's my understanding. So where do I get it in the material that we have with respect to this project? Where do I get a definition of Snowball PAC? Well, there's a picture of it, Your Honor, on Supplemental Excerpts of Record, page 37, which is a map of that particular Protected Activity Center. Okay, I'm on page 37 of Supplemental Excerpts of Record, MSOPAC, Snowball PAC. The dotted line is the trail, and you'll see it skirts the southern edge of that Protected Activity Center. I keep trying to understand this. Am I talking about whether two people are going to interfere with the love life of one boy owl and one girl owl? Well, Your Honor, we wouldn't put it in those particular terms, but that's the issue as to whether there will be more – whether there will be an impact as a result of a potential increase in hikers to the breeding activities of owls. That's the issue that's been raised. And there's one couple – the Forest Service believes there's one owl couple living in that area? What the Forest Service does with respect to those Mexicans spotted, our recovery plan is to identify Protected Activity Centers that are centers that are designated specifically around an area where a breeding couple has been found. And then within that, they'll identify nest locations and develop buffers. But basically, they find a couple, one boy owl, one girl owl, and that couple gets 640 acres. And a mule. The other thing you should be aware of with respect to this Protected Activity Center, though, it's one where the breeding success has been good with this owl couple, and it's one where the Fish and Wildlife Service determined that there would be no conditions of incidental take with this particular pack. Let me ask you this. I'm finding your answer helpful. I'm now kind of getting oriented with respect to what's meant by the Snow Bowl PAC. It's a Protected Activity Center for a particular breeding pair and so on. Is this Snow Bowl PAC one of the five PACs, Protected Activity Centers, identified with respect to Alternative C? Yes. Okay. So when we're talking then on page 24 of the EA, Arizona Snow Bowl Facilities Incorporate Snow Bowl PAC, there is no impact on, now this is a jump, but I want to make sure I can make it, and you tell me if I can't. Is there any other PAC within the boundaries of the Snow Bowl Expansion Project than the one that we've just had referred to here? I don't know the answer to that, Your Honor. I don't know the answer. There may be. Why don't we know that? What I understand the record to be saying is that there will be one where there's a potential combined impact. I understand that, but what I'm trying to figure out, because I'm trying to get back to the argument, but maybe the other side is that we need to have a cumulative impact analysis of the two projects that go forward side by side. I'm making up this number. I'm not trying to shove this number down your throat, but I'm making up this number. What happens if the expansion of the Snow Bowl Ski Facility adversely impacts 25 PACs, 25 Protected Activity Centers for 25 breeding pairs, only one of which is right here. So we have 25 by the Snow Bowl Expansion Project, and we have five with one overlap with this Arizona project. All of a sudden, the impact on the Spotted Owl begins to look very different from, well, this one trail is going to have this impact on these five areas, and only one of them is within the Snow Bowl. And you can't tell me whether there's only one within the Snow Bowl or 25. Let me answer it this way, Your Honor. When you first asked the question, you asked how many were within the Snow Bowl boundaries. I don't know the answer to that question. As I read the record, what I understand the record to be saying is the Snow Bowl Facilities Improvement Project will contain activities that may affect one Mexican Spotted Owl Protected Activity Center. No, it doesn't say that. It says the Arizona Snow Bowl Facilities Improvement Proposal incorporates the Snow Bowl PAC. And you've just told me, you've just pointed, you've just given me that Snow Bowl PAC. And I appreciate that, Your Honor, and I understand the distinction. There's the possibility that there may be other, because the sentence doesn't specifically say. How many others it might also incorporate. It doesn't specifically say, and by the way, we're not impacting other protected activity centers. We can get you that information. Well, it's not a question of whether you can get it from me. The question is whether it ought to be in the EA. Well, there must be more in here, but I can't understand the words. It says due to timing restrictions. Now, I know people ski except for water skiing when there's snow. So I assume they're talking there about when there's snow. I don't know when owls breed. I suppose these biologists do know when owls breed. Do they breed year-round like people or do they just breed in the spring or what? The breeding period is in the record. I believe it's March to August is the breeding season. There's an overlap with the peak hiking season and the breeding season of the owl. It's my understanding there wouldn't be an overlap with the peak ski season. It depends on whether or not they let the treated sewage effluent be used to make artificial snow because if they do, there will be skiing in March. Your Honor, yes. I mean, there may be some skiing late in the season that overlaps with the early part of the breeding season. No, more than may. If that project goes forward, the very purpose for the project is that skiing will go on in March. Yes, Your Honor. Does this mean? Sorry, go ahead. If Mr. Tucker is right that there's a defect in the EA in terms of the cumulative effect, and we were to send it back, what would be involved in correcting that? A reanalysis of the impact and a further decision by the Forest Service. We don't believe there is, and I know you don't because you're here, but, I mean, if that were the result, it would go back and then they would be able to keep intact everything they have and just simply add to it with an improved beefed-up cumulative analysis? Is that the way these things work? Yes, Your Honor. If there's the sense that the record is deficient in the sense of identifying where are the other in the larger area and whether specific other protected activity centers are impacted, it would be sent back. Is it a cause for concern to us, do you think, that they argued before Judge Carroll that there was a defect in the cumulative impact analysis? Judge Carroll doesn't seem to mention that one way or the other. It didn't cause concern at the district court level, Your Honor. We identified this project. We identified where there would be cumulative impacts, and we analyzed it. He says there's the cumulative impact portion of the EA is inadequate, and Judge Carroll doesn't answer that argument. Well, it's de novo review, obviously, for this court, Your Honor, and we think it wasn't answered specifically in the district court, but the very reason the court gave is the court said that the remainder of the arguments don't have merit. I fully considered them. Do I understand this sentence right, that what it means is there is one breeding pair of spotted owls in a 640-acre parcel that also includes the Snow Bowl ski area, and the trail will pass within one-and-a-half miles of this 640-acre parcel that includes that particular breeding pair? The trail will pass through a very small portion of the protected activity center but greater than half a mile away from the known nest locations as shown on the diagram that I pointed out, Your Honor. I understand. So we're just talking about one pair of breeding owls that's already within the Snow Bowl protected area and will also be crossed by the trail? That's correct, Your Honor. So there's a single 640-acre parcel. Well, they're a single breeding owl pair, and right now the ski area and the planned trail will both impinge on that owl couple's 640-acre lot. That's with respect to the cumulative impact analysis. There are other, as the record discloses, there are other protected activity centers where there's some potential impact and that have been fully studied and analyzed by the Forest Service as part of this project. Just to say there are five total in this project. Right. And an unknown additional number within the Arizona Snow Bowl ski area project. I want to toss you a lifeline on this. I gave you 25. That's a preposterous number because you've got to know what the total acreage is for the entire Snow Bowl, which is not enough possibly to fit in 25 PACs. Your Honor, I'm certain there are not 25 protected activity centers. I read the record to give, you know, a presumption of regularity to the Forest Service that they identified those protected activity centers that would be impacted by the facilities improvement project, and that's exactly what they did. They said this one will be. It will overlap with this project. The impacts are insignificant. The Fish and Wildlife Service agreed there wouldn't even be a condition of incidental take at that protected activity center. Thank you, counsel. Thank you. Counsel. Your Honor, I hope to make four brief points. I think maybe the first concern and highest priority is we don't know the number of hikers, which would be essential to a EA. The biological opinion at B-12 states it is reasonable to expect that the designation of the trail as a segment of the Arizona Trail will make it a popular destination for recreation, which may result in much higher use than the Forest Service is predicting. They go on to note that the table is from 97 to 2,000, and that 99 and 2,000, it's skewed due to fire danger in closing the forest. They state the data does not reflect the use by local residents that access from other portals. In addition, the peak recreation period will overlap the entire MSO breeding season, 3-1 to 8-1. I think Your Honor was correct that 2,000 figures were 50,000 people, roughly 9 to 10,000 a month, 300 a day. That's also noted by the biological assessment and evaluation. Excuse me, that's a BAE. That's the Forest Service saying we have only subjective data that suggests upward trends in the numbers of people using these areas. Designation of the Arizona Trail is expected to elevate these trends. And here's the conclusion. The designation will be slightly additive, slightly additive. There's just no analysis for even the number of people that will use it, let alone whether that use is reasonable. The other thing that bothers the Wilsons is this designation of high and low elevation. Judging from the appendices and the contour lines, it looks like there's approximately at the maximum 500 feet difference in elevation between C and D. That's a difference between 8,900 feet, 84, not high or low elevation, both high elevation. I would ask, oh, I hate to get into this, but PACs don't necessarily mean one couple. There could be multiple couples, any number of vowels in those PACs. Last, Your Honors, if I could. Part of the lack of rationality came from my reading of page 19 of the EA. It states alternative D has the least effect on the Mexican spotted owl habitat, followed by A and C. Alternative D has the least effect on the northern goshawk habitat, followed by C and A. Alternative D is expected to have the least human bear encounters, followed by C and A. Alternative D does not pass through key nesting and brooding turkey habitat. A and C both do. Alternative D has the least chance of lion encounters. All of this, again, I believe speaks to the lack of rationality between the choice and the facts. Thank you, Your Honors. Thank you, counsel. Wilson v. Turner is submitted.
judges: Kleinfeld, Silverman, Fletcher